**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 31, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

SCOTTSDALE CAPITAL ADVISORS,
an Arizona corporation,

     Plaintiff - Appellant,

v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

     Defendant - Appellee.

No. 25-4000

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:18-CV-00504-CW)**
_____

Maranda E. Fritz, Maranda E. Fritz PC, New York, New York (Aaron D. Lebenta, Clyde Snow & Sessions, P.C., Salt Lake City, Utah, with her on the briefs), for Plaintiff-Appellant.

Rachel M. McKenzie, Senior Appellate Counsel (Jeffrey B. Finnell, Acting General Counsel; Tracey A. Hardin, Solicitor; Daniel Staroselsky, Assistant General Counsel; and Stephen Silverman, Appellate Counsel, with her on the brief) Securities and Exchange Commission, Washington, D.C., for Defendant-Appellee.
_____

Before **HARTZ**, **KELLY**, and **TYMKOVICH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Plaintiff Scottsdale Capital Advisors is a retail brokerage firm and registered

broker-dealer. It sued the Securities and Exchange Commission (SEC) in the United States District Court for the District of Utah, challenging Exchange Act Rule 17a-8, which requires brokers and dealers to comply with certain reporting and record-retention requirements imposed by the Treasury Department under the Bank Secrecy Act (BSA). Scottsdale claims that the SEC violated the Administrative Procedure Act (APA) by using Rule 17a-8 to impose BSA requirements on broker-dealers.

To pursue a challenge under the APA, the challenger must identify an unlawful "final agency action." 5 U.S.C. § 704. The action selected by Scottsdale was the SEC's filing an enforcement action in New York federal court against Alpine Securities Corporation, a self-clearing broker-dealer which shares common ownership with Scottsdale. The Utah federal court dismissed Scottsdale's complaint for lack of statutory standing because Scottsdale had not challenged a final agency action. *See Alpine Sec. Corp. v. SEC* (*Scottsdale*), No. 2:18-CV-00504-CW-CMR, 2024 WL 4681816, at *9–13 (D. Utah Nov. 5, 2024). Exercising jurisdiction under 28 U.S.C. § 1291, we agree and affirm the dismissal.

## I.    BACKGROUND

### A.    Regulatory Background

The dispute before us concerns regulations requiring banks and other financial institutions to maintain records of potentially suspicious financial transactions. In 1970, Congress enacted the BSA, Pub. L. No. 91-508, 84 Stat. 1114 (1970), and the Treasury adopted implementing regulations. *See* Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912, 6912–15 (Apr. 5, 1972)**;** *see*

*generally SEC v. Alpine Sec. Corp.* (*Alpine IV*), 982 F.3d 68, 73–75 (2d. Cir. 2020) (discussing history of BSA and Rule 17a-8). But it left to the SEC the task of ensuring that "brokers and dealers in securities" complied with those BSA regulations. 37 Fed. Reg. at 6915. To that end, the SEC relied on Section 17(a)(1) of the Exchange Act of 1934, 15 U.S.C. § 78q(a)(1),[1] to promulgate Rule 17a-8, requiring brokers and dealers to "comply with the reporting, recordkeeping and record retention requirements" that had been imposed by the Treasury under the BSA. Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 61454, 61455 (Dec. 17, 1981). Critically, the SEC did not set out specific recordkeeping requirements in Rule 17a-8 because it intended the rule to track, and evolve with, the Treasury's regulations. *See id.* (explaining that "[t]he rule does not specify the required reports and records so as to allow for any revisions the Treasury may adopt in the future").

Since the SEC adopted Rule 17a-8 in 1981, there have been a handful of changes to this regulatory scheme. In 1990, for example, the Treasury established the Financial Crimes Enforcement Network (FinCEN) and delegated to it the authority to identify noncompliance with the BSA. *See* Organization, Functions, and Authority Delegations: Financial Crimes Enforcement Network, 55 Fed. Reg. 18433, 18433–34 (May 2, 1990). Despite these changes, the division of labor between the Treasury and the SEC has

---

[1] Section 17(a)(1) requires brokers and dealers to "make and keep for prescribed periods such records . . . and disseminate such reports as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter." 15 U.S.C. § 78q(a)(1).

remained the same: the Treasury updates the rules generally, and the SEC enforces them insofar as they apply to brokers and dealers. *See Alpine IV*, 982 F.3d at 78–79 ("[T]he Treasury and the SEC have plainly worked in tandem, issuing policy statements and reports, and initiating enforcement actions since the BSA's inception").

Thus, when the Treasury expanded its regulations in 2002 to require brokers and dealers to file Suspicious Activity Reports (SARs), it left it to the SEC and self-regulatory organizations (comprising registered securities associations and national securities exchanges) to "address broker-dealer compliance" under Rule 17a-8. Financial Crimes Enforcement Network; Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44048, 44049 (July 1, 2002). Scottsdale takes issue with this division of labor. It contends that the SEC has violated the APA by relying on Rule 17a-8 as authorization to enforce the Treasury's SAR regulations without complying with the notice-and-comment requirements of the APA to promulgate its own regulations. *See Alpine IV*, 982 F.3d at 80–81 (rejecting Alpine's claim that Rule 17a-8 violates the APA by automatically incorporating future BSA requirements).

B.    **Procedural History**

In June 2017 the SEC filed a judicial enforcement action against Alpine in the Southern District of New York. The SEC alleged that Alpine had violated Rule 17a-8 thousands of times by failing to file SARs, filing deficient SARs, or failing to retain documentation for filed SARs. Scottsdale was not a named party in that action, but it shares common ownership with Alpine. And for most of the suspicious transactions at

issue in the Alpine action, Scottsdale was the "introducing broker," *SEC v. Alpine Sec. Corp.* (*Alpine III*), 413 F. Supp. 3d 235, 240 (S.D.N.Y. 2019)—that is, it performed the customer-facing services, *see* Henry F. Minnerop, *Clearing Arrangements*, 58 Bus. Law. 917, 920–23 (2003) (explaining clearing arrangements and difference between clearing and introducing broker-dealers).

Alpine moved for summary judgment "principally on the ground that the SEC is not authorized to enforce BSA regulations via Rule 17a-8." *SEC v. Alpine Sec. Corp.* (*Alpine I*), 308 F. Supp. 3d 775, 795 (S.D.N.Y. 2018). It also moved for judgment on the pleadings on the ground that the SEC had failed to plead that Alpine had the mens rea required to violate the BSA. *See id*. at 797–98. The district court denied both of Alpine's motions and granted the SEC's cross-motion for summary judgment on a number of claims. *See id.* at 812.

Just four days after the New York district court denied Alpine's requests for reconsideration or appellate certification of the order granting partial summary judgment, Alpine and Scottsdale jointly filed this lawsuit in Utah federal district court seeking declaratory and injunctive relief against the SEC under the APA, 5 U.S.C. §§ 551–559, 701–706. The New York district court promptly enjoined them from pursuing the Utah action until the conclusion of any appeal from that court's final judgment. *See Scottsdale*, 2024 WL 4681816, at *5. The Utah court stayed this action in accordance with that injunction. Meanwhile, the SEC won partial summary judgment on additional claims in New York, decided not to pursue the claims on which it had not obtained a summary judgment, and obtained a $12 million civil penalty against Alpine. *See SEC v. Alpine Sec.*

*Corp.* (*Alpine II*), 354 F. Supp. 3d 396, 445 (S.D.N.Y. 2018) (summary judgment for SEC); *Alpine III*, 413 F. Supp. 3d at 244, 251 (voluntary dismissal and civil penalty). The Second Circuit affirmed both the summary judgment and the penalties. *See Alpine IV*, 982 F.3d at 76, 80–81, 86. Once the District of Utah lifted its stay, Alpine voluntarily dismissed its claims. But Scottsdale proceeded.

Scottsdale's amended complaint said that it sought to "establish the invalidity of the SEC's attempt to use Exchange Act Rule 17a-8, 17 C.F.R. § 240.17a-8, to enforce, administer and interpret the . . . SAR . . . regulations of the Bank Secrecy Act." Aplt. App., Vol. I at 11. The SEC moved to dismiss Scottsdale's amended complaint, arguing that Scottsdale "failed to identify final agency action subject to APA review, that it lacked Article III standing, and that its claims were untimely because any final agency action subject to APA review occurred many years before Alpine and Scottsdale filed this lawsuit." Aplee Br. at 13.

In its brief in opposition, Scottsdale said multiple times that the final agency action it was challenging was the filing of the Alpine enforcement action. *See, e.g.*, Aplt. App., Vol. I at 136 ("The final agency action giving rise to Scottsdale's claim is the filing of the Alpine Enforcement Action"); *id.* at 160 ("To the extent it is necessary to pin-point a more concrete final agency action than the SEC's abject disregard of the procedures imposed upon it by law, this can be easily accomplished by viewing such action as the Commission's approval of the filing of the Alpine Enforcement Action"). And at a hearing before the district court, Scottsdale's counsel reiterated that "[t]he final agency action in this, under these peculiar circumstances, was the Alpine case." Aplee. Suppl.

App. at 94; *see id.* at 93. Until the Alpine action, argued Scottsdale, "the SEC had never issued a statement, had never stated to the industry, and had never adjudicated the issues" that the agency presented in that case. *Id*. at 94.[2] As Scottsdale saw it, it was the SEC's positions in the Alpine action that subjected Scottsdale to a new SAR enforcement regime and exposed it to new regulatory burdens. The district court granted the SEC's motion to dismiss on several grounds, including that Scottsdale "lacks statutory standing to bring its claims in this action" because the SEC's decision to file the New York action against Alpine "was not final agency action." *Scottsdale*, 2024 WL 4681816, at *13.[3]

---

[2] Scottsdale argues on appeal that the district court erred because it "narrowly focused" on the SEC's decision to file the Alpine action. Aplt. Br. at 28. It says for the first time that the final agency action here could have been a "series of agency pronouncements." *Id*. at 29 (quoting *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000)). Scottsdale also relies on the Supreme Court's decision in *Corner Post v. Board of Governors of Federal Reserve System*, 603 U.S. 799 (2024), to argue that it can challenge earlier final agency actions, such as the promulgation of Rule 17a-8 in 1981, because it was not injured until the Alpine action. We need not consider these arguments because they were not raised below. *See Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1336 (10th Cir. 2004). The only final agency action that Scottsdale identified below was the filing of the Alpine action. Scottsdale's counsel conceded this at oral argument. *See* Oral Arg. Tr. at 1:48–2:25 ("The Court: You make those arguments on the merits thoroughly in your briefing, but the question is, or at least one of the questions is, you have to be challenging a final agency action, and the only action, the only thing you identified as final agency action in the district court, you repeatedly said, was the filing by the SEC of the complaint in federal district court in New York." Counsel: "That is correct.")

[3] The district court further held that even if there had been a final agency action here, Scottsdale still lacked statutory standing because it "ha[d] not alleged facts sufficient to show that it ha[d] suffered a 'legal wrong' or been 'adversely affected or aggrieved within the meaning of the relevant statute'" because of the SEC's decision to file the New York action against Alpine. *Scottsdale*, 2024 WL 4681816, at *13 (ellipsis omitted). Because we agree with the first ground relied on by the district court, we need not reach its alternative ground. Nor need we reach the issue of Article III standing. *See*

7

## II.   DISCUSSION

### A.   Final Agency Action

There being no relevant factual disputes, we review de novo the district court's dismissal of Scottsdale's APA claim for lack of subject-matter jurisdiction. *See Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 157 F.4th 1235, 1248 (10th Cir. 2025) (treating the final-agency-action requirement as jurisdictional). The sole question before us is whether the SEC engaged in a final agency action when it decided to sue Alpine in the Southern District of New York. We hold that it did not.

Where review of an agency action is not expressly provided for by statute, judicial review under the APA is available only for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Custodia*, 157 F.4th at 1249. Once a final action has been identified, a reviewing court can "hold unlawful and set aside [that] agency action [and the agency's] findings[] and conclusions." 5 U.S.C. § 706(2).

This court has recently set forth the requirements for agency action to be considered final agency action for purposes of the APA. In *Custodia* we addressed the issue as follows: Quoting the Supreme Court's opinion in *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), we said that "[t]o be 'final', an agency action must (1) 'mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature'; and (2) 'be one by which rights or obligations have

---

*Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) (no need to address Article III standing if statutory standing is lacking).

been determined, or from which legal consequences will flow.'" 157 F.4th at 1249. And we recognized that an agency action "must itself be the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope of their statutory rights or duties." *Id.* (brackets and internal quotation marks omitted).

Scottsdale challenges the SEC's decision to file a complaint against Alpine in federal court. But this action by the SEC does not satisfy the second part of the *Bennett* test and therefore cannot be considered final agency action under the APA. We affirm the dismissal of the complaint on this ground without deciding whether the SEC's action could satisfy the first part of the *Bennett* test. *See Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593, 597 (9th Cir. 2008) (no jurisdiction where the challenged action satisfied the first *Bennett* requirement but not the second).

Our analysis in *Custodia* is instructive. There, we considered whether an email from the Federal Reserve Board (the Board) to the Federal Reserve Bank of Kansas City (FRBKC) was a final agency action for purposes of the APA. Custodia Bank had requested access from the FRBKC to a master account, which would have allowed it to use various Federal Reserve services. *See* 157 F.4th at 1245. Although approval or denial of such an account was a decision for the FRBKC, the Board had issued an internal guidance document "provid[ing] that any Reserve Bank that is considering denying any access request[] should consult the Board prior to communicating any decision to the requesting institution." *Id.* at 1245 (original brackets, ellipsis, and internal quotation marks omitted). In compliance with this guidance, the FRBKC advised the Board of its intent to deny Custodia's request for access, and the Board responded with an email to the

9

FRBKC saying that it had "no concerns" with that plan. *Id.* at 1249 (internal quotation marks omitted).

We held that the Board's email "fail[ed] the second prong of the *Bennett* test" because it did not determine any rights or obligations and was not itself the source of any legal consequences. *Id.* Nothing in the record suggested that the Board's email "altered the legal regime to which [FRBKC] was subject." *Id.* (brackets and internal quotation marks omitted). Rather, the email "was only an intermediate advisory step," and "it was still up to FRBKC to move forward with its plan to deny the request." *Id.* (brackets and internal quotation marks omitted).

We take further guidance from the application by the Supreme Court of the second-factor test we applied in *Custodia*. In *Bennett*, ranchers and irrigation districts challenged a Biological Opinion and an accompanying Incidental Take Statement (ITS) issued by the Fish and Wildlife Service under the Endangered Species Act, 16 U.S.C. §§ 1531–1544, determining that a longstanding irrigation project would likely jeopardize two endangered species. *See* 520 U.S. at 158–59. The ITS required the Bureau of Reclamation to initiate "'reasonable and prudent alternatives,'" such as maintaining minimum water levels in lakes and reservoirs affected by the irrigation project. *Id.* at 159. Addressing the second part of its two-part test, the Court held that the biological opinion and the ITS had "direct and appreciable legal consequences" because they "alter[ed] the legal regime to which the [Bureau] [was] subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." 520 U.S. at 178; *see*

10

*also* 16 U.S.C. § 1532(19) (defining *take* as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect").

In *U.S. Army Corps of Engineers v. Hawkes*, 578 U.S. 590, 593 (2016), the plaintiff challenged an "'approved jurisdictional determination'" (JD) by the Corps that a parcel of property contained "waters of the United States." The determination expressed the agency's "definitive view," *id.*, and was binding for five years on the Corps and the Environmental Protection Agency, which enforce the Clean Water Act, 33 U.S.C. §§ 1251–1389. *See id.* at 595. A negative determination would "limit[] potential liability a landowner faces for discharging pollutants without a permit," because it "create[s] a five-year safe harbor from [agency civil-enforcement proceedings] for a property owner." *Id.* at 598–99. On the other hand, a positive determination would expose the landowner to such enforcement actions. Thus, "[b]ecause legal consequences flow from approved JDs, they constitute final agency action." *Id.* at 599 (ellipsis and internal quotation marks omitted).

In *Sackett v. EPA*, 566 U.S. 120, 122 (2012), the plaintiffs challenged an EPA compliance order declaring that their land was subject to the Clean Water Act and that they had violated the Act, and directing them to restore their property immediately in accordance with a work plan prepared by the agency. The compliance order had several legal consequences. In addition to having to restore their property and "give the EPA access to their property" and records, the plaintiffs were also exposed to "double penalties" in future enforcement proceedings and would be limited in their

11

ability to obtain certain permits. *Id.* at 126. Those consequences were sufficient to satisfy the second part of the *Bennett* test.[4]

And although it predates *Bennett*, the opinion in *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980), established that the burden of litigation is not the type of burden that renders an agency action final. That opinion considered whether an agency's decision to initiate an administrative complaint constituted a final agency action. *See id.* at 233. The Court acknowledged that it takes a "flexible view of finality" in the APA context and recognized that "the issuance of the complaint is definitive on the question whether the Commission avers reason to believe that the respondent to the complaint is violating the Act." *Id.* at 240–41. But it held that, "[s]erving only to initiate the proceedings," the complaint could not be considered a final agency action. *Id.* at 242. The Court explained that the complaint had "no legal force or practical effect upon [plaintiff's] daily business other than the disruptions that accompany any major

---

[4] The Supreme Court recently applied *Bennett* in a challenge to President Biden's efforts to rescind and terminate President Trump's Migrant Protection Protocols (MPPs). *See Biden v. Texas*, 597 U.S. 785 (2022). After a district court enjoined and vacated the Biden administration's initial memorandum rescinding the MPPs, the administration issued a second memorandum in which it rescinded the first memorandum and offered a new justification for its decision to terminate the MPPs. *See id.* at 793–95, 808. The Supreme Court declared, without elaboration, that the second memorandum was a final agency action because it satisfied both prongs of *Bennett*—it "marked the consummation of the agency's decisionmaking process and resulted in rights or obligations being determined." *Id.* at 808 (brackets and internal quotation marks omitted). *But see id.* at 832–33, 833 n.7 (Alito, J., dissenting) (stating that the second memorandum could not be implemented until vacatur of the district-court injunction against implementation of the first memorandum and suggesting that the majority was taking an "expansive, formalist approach" to the second *Bennett* factor contrary to the Court's longstanding "'pragmatic'" approach to finality).

litigation." *Id.* at 243. And to the extent the complaint imposed upon plaintiff "the burden of responding to the charges made against it," *id.* at 242, that "expense and annoyance" was "part of the social burden of living under government." *Id.* at 244 (internal quotation marks omitted). Such burdens are "different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." *Id*. at 242.

Neither *Bennett* nor any other later Supreme Court opinion has suggested any discomfort with *Standard Oil*, and lower courts continue to treat it as authoritative. *See Energy Transfer Partners, L.P. v. FERC*, 567 F.3d 134, 140–41 (5th Cir. 2009) (applying *Standard Oil* and holding that agency order alleging violations and initiating administrative proceeding imposed a substantial burden, but one that was "different in kind and legal effect" from what is needed to be considered a final agency action (internal quotation marks omitted)); *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 174 (4th Cir. 2025) (citing *Standard Oil* for proposition that the initiation of enforcement proceedings is the "type[] of agency action that traditionally fail[s]" the two-part *Bennett* test), *abrogated on other grounds by Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361 (4th Cir. 2026) (en banc); *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990) (applying *Standard Oil* and holding that agency's decision to issue an administrative complaint was not final where it imposed only litigation expenses and the mere possibility of financial loss).

### B.    Application to This Case

Scottsdale contends that filing the Alpine suit was final agency action. It argues that "[t]he SEC's assertion of jurisdiction and its interpretations of the BSA

requirements have legal consequences for broker-dealers . . . who are subject to that authority." Aplt. Br. at 34–35. According to Scottsdale, the SEC, in filing its complaint against Alpine, "effectively created its own new and harsher SAR enforcement regime" under which it could "pursue its claims on a strict liability basis and impose higher penalties" than those allowed under the BSA. *Id*. at 18. And, it continues, through this enforcement regime the SEC created new "bright-line" obligations, *id.* at 37, including an "objective obligation to file a SAR whenever [a broker-dealer] is alerted to a red flag in a sizeable transaction of low-priced securities." *Id*. at 36. Because Scottsdale was left with "no choice" but to comply, *id.* at 37, it "had to hire additional compliance personnel, implement changes to its BSA program and significantly increase the number of SARs it filed and the time involved to prepare SARs," *id*. at 38.

But the only obligation or *legal* consequence of filing the Alpine suit was that *Alpine* had the burden of defending itself, a burden that does not suffice to create final agency action. *See Standard Oil*, 449 U.S. at 242–44. And Scottsdale did not even have that burden because it was not named as a party in the action and had no duty to respond to the complaint. Unlike the plaintiffs in *Sackett*, Alpine (much less Scottsdale) was not ordered to immediately comply with anything. *See Sackett*, 566 U.S. at 126; *see also S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 580 (9th Cir. 2019) (orders being challenged required "immediate compliance" (internal quotation marks omitted)). Scottsdale was not exposed to enhanced penalties as a result of the filing of the complaint against Alpine. *See Sackett*, 566 U.S. at 126. In

14

short, the complaint itself did not "alter the legal regime" to which the SEC, Scottsdale, or any regulated party was bound, even if the ultimate judgment would constitute law. *Bennett*, 520 U.S. at 178. It therefore cannot be a final agency action under our approach set forth in *Custodia.*

Scottsdale suggests, however, that we take a pragmatic approach to *Bennett* and consider the practical, day-to-day effects that the Alpine action has had on Scottsdale's business. Although this court has not adopted that approach, we do not reject it out of hand.

To begin with, there is some support in Supreme Court opinions for a more flexible approach that focuses on the practical consequences of an agency action rather than parsing the nitty-gritty of legal rights and obligations. *See* William Funk, *Final Agency Action After* Hawkes*, 11 N.Y.U. J.L. & Liberty 285, 293 (2017) (stating that the Supreme Court has left unanswered the question whether a final agency action must have legal consequences or determine rights or obligations, or whether it is "sufficient that the action have a direct and immediate impact on the person bringing the claim"). And some sibling circuits have taken that approach in certain circumstances. The D.C. Circuit, for example, has held that the second prong of *Bennett* was satisfied in a challenge to a document that the EPA characterized as a nonbinding interpretive policy guidance, but which in effect departed from the agency's prior interpretation of the governing statute and now told each State to "search for deficiencies in [the State's] existing monitoring regulations and replace them through terms and conditions of a permit." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000); *see id.* at 1019–23. More

15

recently, the Fifth Circuit held that the second prong of *Bennett* was satisfied in a challenge brought by the State of Texas to a guidance issued by the Equal Employment Opportunity Commission (EEOC) stating when employers may screen out candidates with a criminal record. *See Texas v. EEOC*, 933 F.3d 433, 437–38 (5th Cir. 2019). The guidance "ha[d] the effect of committing the agency itself to a view of the law that, in turn, force[d] the plaintiff either to alter its conduct, or expose itself to potential liability." *Id.* at 446 (internal quotation marks omitted). It also "purport[ed] to bind EEOC staff" when investigating certain Title VII disparate-impact claims. *Id.* at 445. And it established two safe harbors by which employers could avoid Title VII liability. *See id.* at 443–44. The court concluded that the guidance affected potential Title VII plaintiffs "in a way that carrie[d] legal consequences and dictate[d] employers' rights and obligations." *Id.* at 443.

But even if we fully endorsed the "pragmatic" approach employed in those cases, there are two independently sufficient grounds for declining to treat the SEC complaint against Alpine as a final agency action. First, the consequences of which Scottsdale complains were not caused by the filing of the Alpine action. Scottsdale says that it was the SEC's positions in the Alpine action that "created onerous new regulatory costs, burdens and uncertainty, particularly for broker-dealers (like [Scottsdale]) specializing in the microcap/OTC markets, with respect to the SAR filing obligations under the BSA." Aplt. App., Vol. I at 142 (Brief in Opp'n to Mot. to Dismiss). In Scottsdale's view, the SEC, simply by asserting that it could enforce SAR requirements under Rule 17a-8, had subjected securities broker-dealers to a secondary SAR enforcement regime that imposed

16

"different standards" than did the Treasury "as to, *inter alia*, what constitutes a violation, the applicable mens-rea, and the penalty amounts and other remedies for a violation." *Id*. at 143. As a result, Scottsdale had to "devote substantial time and resources to implement changes to its BSA compliance program and SAR preparation to avoid regulatory inquiry and enforcement action." *Id.*

To say that these burdens arose from the filing of the Alpine complaint, however, is to ignore history. The position of the SEC on these matters was unambiguous well before the complaint was filed. In 2002 FinCEN extended the SAR requirements to brokers and dealers, explicitly stating not only that that broker-dealers would be subject to an objective standard for SAR compliance, but also that those requirements would be enforced by the SEC under Rule 17a-8. *See* 67 Fed. Reg. at 44049, 44053. If Scottsdale could somehow have thought this was an empty threat that the SEC would never seek to carry out, it should have been disabused of that hope when the SEC publicly stated in announcements of several settlements that it could enforce BSA regulations via Rule 17-a-8, *see, e.g.*, *Park Fin. Grp.*, *Inc*., Exchange Act Release No. 56902, 92 SEC Docket 232, at *3–4 (Dec. 5, 2007) (imposing a cease-and-desist order and sanctions), or when the SEC expressly incorporated the 2002 SAR requirements in its 2011 technical amendments, *see* Technical Amendments to Rule 17a-8: Financial Recordkeeping of Currency and Foreign Transactions, 76 Fed. Reg. 11327, 11327–28 (Mar. 2, 2011).

And to the extent that Scottsdale says that the Alpine complaint broke new ground by claiming violations based on "*strict liability*," Aplt. Br. at 35, (rather than the

negligence required under the BSA) and sought remedies not provided in the BSA, it is ignoring that there was nothing new about such claims and remedies in SEC actions. Not only had the SEC contended for decades that no scienter was required for sanctions to be imposed for violations of record-keeping regulations under Section 17(a), but the SEC had prevailed in court on that contention. *See Stead v. SEC*, 444 F.2d 713, 716–17 (10th Cir. 1971) (stating that defendant's knowledge that the securities deposited were not recorded was sufficient to establish recordkeeping violation under Section 17(a) of the Exchange Act, without mention of a need to have knowledge of the recordkeeping regulations); *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 610 (S.D.N.Y. 1993) ("Scienter need not be shown to prove a violation of section 17(a)(1) of the Exchange Act and the rules thereunder"); *cf. SEC v. McNulty*, 137 F.3d 732, 740–41 (2d Cir. 1998) (deferring to SEC position that scienter is not a required element for civil penalties for failure to comply with reporting requirements under Section 13(b) of the Exchange Act because that section of the Act "contains no words indicating that Congress intended to impose a scienter requirement" (internal quotation marks omitted)). Once it was clear that the SEC intended to proceed under the Exchange Act for violations of the BSA by broker-dealers, broker-dealers were on notice of the risk of liability under SEC standards (with which they would have been quite familiar).

Hence, none of the consequences Scottsdale complains of actually "flow" from the filing of the Alpine action. *Bennett*, 520 U.S. at 156. And it is the purported final agency action being challenged that must "itself be the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope of their statutory rights

or duties." *Custodia,* 157 F.4th at 1249 (brackets and internal quotation marks omitted); *see Sinclair Wyo. Ref. Co. v. EPA*, 72 F.4th 1137, 1144 (10th Cir. 2023) (agency action was not final where it "tread no new ground, leaving the world just as it found it" (brackets and internal quotation marks omitted)). That is true whether a court limits its inquiry to purely legal obligations, *see, e.g.*, *Sackett*, 566 U.S. at 126 (identifying legal obligations imposed on plaintiffs "[b]y reason of" the action), or instead considers practical, everyday effects, *see, e.g.*, *Appalachian Power*, 208 F.3d at 1023 (taking a pragmatic approach but nevertheless emphasizing that the agency "created" obligations "*[t]hrough the Guidance*" (emphasis added)).

Second, as long as we are being pragmatic, treating a court-filed complaint as a final agency action reviewable under the APA would be a nonstarter. To begin with, APA review of final agency action is available only if "there is no other adequate remedy in a court." 5 U.S.C. § 704. The party being sued obviously has a remedy in a court—namely, it can defend itself in the court in which the complaint was filed and seek appellate review in that circuit. But it would be ironic if those who are not defendants could seek APA review of the complaint in another court when the defendant cannot. And an APA suit challenging the propriety of the agency's filing the complaint while (or after) the complaint itself is being litigated "cannot be permitted . . . without seriously undercutting the orderly process of the law." *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) (judgment creditors in bankruptcy proceeding cannot collaterally attack Florida bankruptcy court injunction against executing a bond when they seek to execute on bond in Texas federal court).

19

We recognize that Scottsdale disagrees with the Second Circuit's decision in the Alpine action. As Scottsdale suggested to the Utah district court, it filed this lawsuit in the hopes of creating a circuit split by having its issues reviewed by the Tenth Circuit, which it views as "perhaps slightly more independent" than the Second Circuit and as having "a pretty good track record in terms of looking at this kind of issue." Suppl. App. at 92–93 (Tr. of Hr'g on Mot. to Dismiss). Of course, there is nothing inherently wrong with trying to create a circuit split. Just not by attacking the proceedings in another circuit.

### III.    CONCLUSION

Because Scottsdale did not challenge a final agency action below, the district court correctly dismissed its suit for lack of statutory standing under the APA. We **AFFIRM**.